**AMERICAN PECCO CORPORATION,**
Appellant,

v.

**EASTERN FOUNDATION COMPANY, Inc.,**
Concorp, Inc., Contractors, Transport Cor-
poration, Wittstatts, Inc., Appellees.

**CONTRACTORS TRANSPORT CORPO-
RATION, Appellant,**

v.

**EASTERN FOUNDATION COMPANY, Inc.,**
Concorp, Inc., American Pecco Corpora-
tion, Wittstatts, Inc., Appellees.

Nos. 4502, 4503.

District of Columbia Court of Appeals.

Argued Nov. 4, 1969.

Decided April 27, 1970.

Sol Friedman and Leonard L. Lipshultz,
Washington, D. C., for American Pecco.

Thomas B. Heffelfinger, Washington, D.
C., for Contractors Transport Corp.

Branko Stupar, Henry S. Turner, Wash-
ington, D. C., for Eastern Foundation Co.

R. Harrison Pledger, Jr., Charles E.
Pledger, Jr., Washington, D. C., for appel-
lee Concorp, Inc.

John C. Duncan, III, Washington, D. C., for Wittstatts, Inc.

Before FICKLING, KERN and NEB-EKER, Associate Judges.

KERN, Associate Judge:

In May 1964, a large construction crane owned by Concorp, Inc. (Concorp), a general contractor, fell on its job site in Rosslyn, Virginia, killing one person, injuring others, and causing property damage.[1] Concorp had purchased the crane from American Pecco Corporation (Pecco) who, pursuant to the sales agreement,[2] supplied a service representative to supervise the assembly of the crane. Upon Pecco's recommendation, Concorp hired Contractors Transport Corporation (Transport) to supply the labor and equipment for the assembling and rigging of the crane. It was understood by the above three parties that Harvey Chambers, Pecco's service representative on this job, would direct the work of Transport's men. Certain owners of damaged property and subcontractors required to repair their own work damaged by the crane's collapse sued Concorp, who named Pecco as a third party defendant. Pecco, in turn, brought Transport into the action.

Because of the size of the crane[3] and the use of a smaller than normal base, it was necessary to attach guy wires from each corner of the crane tower to anchor points on the ground. Two sets of four guy wires each, or a total of eight wires, were installed, one set from a height of 40 feet on the crane, and the other set from 66 feet.[4] One of the upper guy wires was spliced in a negligent manner. Transport's men, who actually installed the guy wire, recognized the impropriety of the method used for the splice, and pointed that out to Chambers. Chambers, it was alleged, refused to have the splice changed, and in fact had originally ordered it done that way. An employee of Pecco testified at trial that he, too, had recognized the danger from this particular splice, and had complained to someone from Transport, but was informed that the splice was sufficient. Thus, both Pecco and Transport had notice of the improper splice, but neither took steps to correct it or inform the general contractor, Concorp, of its existence. During the final stages of readying the crane for use, it collapsed and Harvey Chambers, who had been on the crane at that moment, was fatally injured. It was later observed that the spliced cable had come apart at the splice, that a turnbuckle on another guy wire had broken, and that the anchor or "deadman" for the lower cable on the same corner as the spliced cable had pulled out of the ground.

The trial judge concluded that the proximate cause of the accident was the improper splice which gave way, and not the broken turnbuckle or the allegedly defective deadman. He further found that "[b]oth companies had control of the job. Likewise, both companies were experts; American Pecco in the erection of cranes and Contractors Transport in the rigging of towers." He therefore found them jointly liable to appellees herein. Concorp was held not to be liable, on the ground that it exercised reasonable care in the selection of its subcontractors. Pecco and Transport appeal, each questioning their own liability, and also cite as error the denial of their claims against Concorp.

1. Additional litigation is now in progress in other jurisdictions.

2. It was unclear from the record whether the sales agreement was entirely written or partially oral.

3. The crane was 72 feet high and had a boom 130 feet in length. It also had a 50 foot counterjib opposite the boom for holding ballast.

4. There was testimony that the lower guy wires were required only during the erection of the crane and were not necessary to keep it in an upright position while in actual operation. However, these lower wires, so-called "construction" cables, were left in place after erection of the crane as an additional safety measure.

Appellants contend that Concorp should have been liable because it negligently poured the concrete footing for the anchor ("deadman") of the lower cable that pulled out of the ground. However, the evidence shows that only the four upper cables, one of which was defective, were *necessary* to keep the crane erect. Had the upper cables been properly installed, the crane could not have fallen. Further, the trial court concluded that because the crane fell in two stages, the upper cable must have given way *before* the footing for the lower cable came loose.

Pecco and Transport each claim that the other had supervision over the erection of the crane and therefore was responsible for its subsequent collapse. Also, each disavows any expertise in the assemblage of the crane. However, the record is clear that employees of Pecco were aware of the fact that the cable was imperfectly spliced but yet took no affirmative steps to correct this defect. The record further shows that Transport professed to be experienced in putting up guy wires on tall structures that would bear stress. Moreover, its *own* evidence disclosed that its employees had sufficiently recognized the impropriety of the splice to prompt comment to Chambers. Under the circumstances Transport can scarcely disclaim knowledge of what constituted improper cable work.

Further, even assuming arguendo that Transport's men became servants of Pecco and prepared the improper splice under Pecco's direction, they could not be absolved of responsibility for their own acts, if they knew them to be negligent. Ciejek v. Crane Service Co., 122 U.S.App.D.C. 91, 95, 351 F.2d 788, 792 (1965); 57 C.J.S. Master and Servant § 577 (1948).

There is strong public policy which dictates that a tort-feasor should be personally answerable for injuries which he inflicts on third persons, or their land, *regardless of whether or not* he is acting *as agent or servant of another.*

Valley Forge Golf Club v. L. G. DeFelice & Son, Inc., 124 F.Supp. 873, 875 (E.D. Pa.1954) (emphasis in original).

The cavalier attitude of both companies,[5] considering the potential danger from a crane of that size collapsing, was inexcusable. Certainly Transport was not helpless, as it urges, in the face of Pecco's alleged refusal to heed its warning that the cable was defective. If an irreconcilable conflict developed between Pecco and Transport, the general contractor, Concorp, could and should have been informed of the situation.

After a careful review of the record we are of opinion that there was substantial support for the trial court's findings with respect to proximate cause and the joint liability of Pecco and Transport, D.C.Code 1967, § 17–305(a), and the non-liability of Concorp. Washington Air Compressor Rental Co. v. National Union Ins. Co., D.C.Mun.App., 165 A.2d 482, 485 (1960).

Affirmed.

---

5. Transport apparently felt some constraint to take further action because of its desire to maintain friendly relations with Pecco, who had recommended it for this and other jobs.